90  333
d100 116
e100 488

## JOHN HANSCOM *vs.* HOME INSURANCE COMPANY.

## SAME *vs.* NORTH BRITISH, ETC., INSURANCE COMPANY.

## Androscoggin.    Opinion June 1, 1897.

*Insurance. Dwelling-House. Non-Occupancy. Waiver. Proofs of Loss. False Swearing. R. S., c. 49, § 20.*

A waiver involves the idea of assent, and assent is primarily an act of the understanding. It presupposes that the person to be affected has knowledge of his rights, but does not wish to enforce them. It is an intentional relinquishment of a known right, and is a question of fact whenever it is to be inferred from evidence adduced, or is to be established from the weight of evidence. Again, it may happen that a waiver of a breach of the condition in a policy is not actually intended; but if the conduct and declaration of the insurer are of such a character as to justify the belief that a waiver is intended, and acting upon this belief the insured is induced to incur trouble and expense and is subjected to delay to his injury and prejudice, the insurer may be prohibited from claiming a forfeiture for such a breach, upon the principles of equitable estoppel.

A policy of fire insurance upon a dwelling-house, furniture and other personal property contained these stipulations :—"This entire policy unless otherwise provided by agreement indorsed hereon, or added thereto, shall be void. . . if the building herein described, whether intended for occupancy by the owner or tenant, be or become vacant or unoccupied, or so remain ten days, . . . . or if the subject of insurance be personal property and be or become encumbered by a chattel mortgage. This entire policy shall be void . . . . in case of any fraud or false swearing by the insured touching any matter relating to this insurance, or the subject thereof, whether before or after a loss."

*Held;* that the fact that the furniture remained in the house, during the owner's absence, and that his hired man made a frequent inspection of the household goods and had a general oversight of the buildings during the day, being on the premises throughout the day every day, is not a full equivalent for the constant supervision involved in the occupancy of the premises as a customary place of abode, and the actual presence in the building of those who are living in it as a dwelling-house day and night.

In this case the company's agent knew that the plaintiff designed and used the premises as a summer residence.

The buildings and a considerable portion of the personal property were wholly destroyed by fire July 22, 1895; and the defendant claimed that the dwelling-house had been unoccupied from the 8th day of January preceding until the

day of the fire, without the knowledge or consent of the insurer or his agent. It was also claimed that the personal property was encumbered by a chattel mortgage prior to the loss, and that there was false swearing by the plaintiff in his formal proof of loss and in his testimony before the court.

*Held;* that if the defendant had denied its liability under the policy by reason of forfeiture, arising from the non-occupancy of the buildings, a cause of action would have accrued within sixty days after such denial. *Also;* that the defendant had waived the alleged forfeiture by failing to make such claim immediately after the fire and refusing absolutely to pay the loss. On the contrary, the company informed the plaintiff that it was *necessary* for him to furnish a schedule of the furniture; that he could take time to furnish it; that what was wanted was the real value of the property and that when the schedule was wanted the agent would come and see him; furnished him with blanks and instructions on which to make proofs of loss, subjected him to trouble and expense in preparing the schedules and proofs of loss; and required his attendance at the general manager's office, at a distance on two occasions, for conference as to the ownership of the property and the extent of the loss. Under these circumstances, covering a period of four months after the fire, the defendant cannot now be permitted to set up in defense a forfeiture of the policy alleged to have been created by the non-occupancy of the buildings.

*Held;* that the mortgage so far as it affects the personal property embraced in the policy was not completed by delivery until the day after the fire; and could not have the effect of increasing the risk of insurance. Hence it would be inequitable now to give effect to the encumbrance as a reason for avoiding the policy,—there being no evidence that the insurance company for nearly three months following the fire intended to refuse payment on account of the mortgage.

*Held;* that erroneous estimates and innocent misstatements are not a cause of forfeiture, when it is conceded that the loss under a policy, honestly stated, exceeds the amount of insurance.

ON REPORT.

The case is stated in the opinion.

*A. R. Savage and H. W. Oakes; Jesse M. Libby,* for plaintiff.

*G. M. Seiders and F. V. Chase,* for defendants.

Non-occupancy: R. S., c. 49, § 20 ; *White* v. *Phoenix Ins. Co.,* 83 Maine, 279, Id. 85 Maine, 97; *Lancy* v. *Home Ins. Co.,* 84 Maine, 492; 1 May, Ins. § 249, A; *Bonenfant* v. *Ins. Co.,* 76 Mich. 654; *Ashworth* v. *Builders Ins. Co.,* 112 Mass. 422; *Keith* v. *Mutual Ins. Co.,* 10 Allen 228; *Hermann* v. *Adriatic Ins. Co.,* 85 N. Y. 162; *Kimball* v. *Monarch Ins. Co.,* 70 Ia. 513; *American Ins Co.* v. *Padfield,* 78 Ill. 167; *Corrigan* v. *Conn. Fire Ins. Co.,* 122

Mass. 298; *Moore* v. *Ins. Co.*, 64 N. H. 140; *Sonneborn* v. *Ins. Co.*, 44 N. J. 220; *Fehse* v. *Council Bluffs Ins. Co.*, 74 Ia. 676; *Litch* v. *Ins. Co.*, 136 Mass. 491.

No waiver: R. S., c. 49, § 21; 2 May on Ins. § 507.

False swearing: *Claflin* v. *Ins. Co.*, 110 U. S. 81; *Sleeper* v. *Ins. Co.*, 56 N. H. 401; *Wall* v. *Ins Co.*, 51 Maine, 32; *Linscott* v. *Ins. Co.*, 88 Maine, 497; *Dolloff* v. *Ins. Co.*, 82 Maine, 266.

Chattel mortgage: *Stewart* v. *Hanson*, 35 Maine, 506; *Flanders* v. *Barstow*, 18 Maine, 357; *Hinch* v. *Ins. Co.*, 112 Pa. St. 128; *Ellis* v. *State Ins. Co.*, 61 Ia. 577; 1 May on Ins. § 291, A; *Treadway* v. *Hamilton Ins. Co.*, 29 Conn. 68; *Sweetser* v. *Lowell*, 33 Maine, 452; *Foster* v. *Perkins*, 42 Maine, 174.

SITTING: PETERS, C. J., FOSTER, WHITEHOUSE, STROUT, JJ.

WHITEHOUSE, J. These actions were brought on two policies of insurance against loss or damage by fire, issued to the plaintiff by the defendant companies respectively. The two cases were heard together and come to the law court on a report of the evidence relating to both claims. The aggregate amount of insurance effected in the two companies on the plaintiff's farm buildings and certain personal property, was $5500. Of this amount $3000 was on the buildings, $1500 on the household furniture, $500 on vehicles, etc., and $500 on horses. It is stipulated in the report that if the defendants are found liable, judgment shall be rendered for the plaintiff for $2100 against the Home Insurance Company and for $3000 against the North British and Mercantile Insurance Company.

Each policy contains the following stipulations: "This entire policy, unless otherwise provided by agreement indorsed hereon, or added hereto, shall be void . . . . . if a building herein described, whether intended for occupancy by the owner or tenant, be or become vacant or unoccupied, or so remain for ten days, . . . or if the subject of insurance be personal property and be or become encumbered by a chattel mortgage."

"This entire policy shall be void . . . . in case of any

fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss."

Thereupon it is contended, in behalf of the defendants, that they are justified by the evidence in resisting payment on the three distinct grounds covered by the foregoing stipulations in the policies.

The buildings and a considerable portion of the personal property were totally consumed by fire about 11 o'clock P. M., on the 22nd of July, 1895; and it is claimed that the dwelling-house had been unoccupied from the 8th day of January preceding until the date of the fire, without the knowledge or consent of the defendants or their agents. It is also claimed that the personal property covered by the policies was encumbered by a chattel mortgage after the execution of the policies and prior to the loss; and that there was false swearing on the part of the plaintiff after the loss, in his formal proof of loss, and in his testimony before the court when the evidence was reported for this court.

The buildings in question were situated on the southerly side of a road running nearly east and west, on White Oak Hill in the town of Poland, about two miles from the nearest village. At a distance of about eight hundred feet westerly was the town farm, and still further west were two other farm houses distant about one-third of a mile and one-half of a mile respectively. Next easterly from the plaintiff's buildings on the same road, was a small house about a quarter of a mile distant, occupied by an elderly lady. Two hundred feet further to the east was another small house, and a half mile to the east of the plaintiff's buildings was another farm house.

The plaintiff's buildings consisted of a dwelling-house thirty feet wide on the street and running back thirty-five feet, a stable thirty-nine and one-half feet by sixty, and a shed one hundred feet long connecting the house with the stable.

The plaintiff's home was in Brooklyn, in the State of New York, but he occupied these premises in Poland during the summer months, spending the rest of the year in New York.

In the fall of 1894, he left the premises and returned to

Brooklyn on the 13th of September, leaving his sister Mrs. Lane and one Holmes and his wife in charge of the premises and in the actual occupancy of the house. Mrs. Lane died soon after, but Holmes and his wife remained until January 9, 1895, when they left. At this time there were two colts, one horse, five or six hogs and thirty or forty hens on the premises, belonging to the plaintiff. Thereupon a young man named Thurston, who lived with his grandmother in the first house east of the plaintiff's, a quarter of a mile distant, was engaged by the plaintiff to take charge of the premises and take care of the stock. Thurston continued to live at his grandmother's home, sleeping there and generally taking his meals there, from that time until the date of the fire. No one slept in the plaintiff's house during this time, but Thurston ate some of his meals there, which were brought to him from his home, and was on the premises throughout the day every day, except when called away by business for the plaintiff, with a single exception when he procured some one to take his place. He piled up the wood, helped cut the hay, took care of the garden and had the general oversight of the place. Early in May, 1895, he cleaned the house and put it in order for the reception of Mr. Hanscom and his family and from that time forward he went through the house nearly every day and dusted, swept and aired it. Prior to July 22, the coverings had been taken off the furniture, and on that day Thurston was engaged in cleaning up around the buildings outside and inside. The blinds were all open, the windows up and the screens in place. During the summer months the doors of the barn were generally open, and those of the carriage house frequently were. The day before the fire occurred at night these doors were open all day. After the screens were put in, a month before the fire, the windows in the house had generally been open during the day. It was Thurston's practice when he got ready to go home nights, to begin at the further end of the barn and pass through the barn and carriage house, fastening the doors as he proceeded, and thence through the house and out of the front door. On the day of the fire he had been through the entire house, airing every room, and left the buildings with all the doors securely fastened.

Under these circumstances and in view of the fact that it must have been well understood by the defendant's agent, Mr. Gammon, who had been a frequent visitor there for several years, that it was designed and used by the plaintiff as a summer residence, it is contended by the plaintiff's counsel, in the first place, that the house ought not to be deemed to have been "unoccupied or vacant" at the time of the fire, within the meaning of the terms of the policy; or if so, that any presumption of increase of risk ordinarily arising from non-occupancy is fully rebutted by the peculiar circumstances and conditions existing in this case, and by the appearances of occupancy and the precautions actually taken for the protection and safety of the premises.

It is the opinion of the court that the plaintiff's contention upon the first proposition is not sustained.

The fact that the furniture remained in the house and that the plaintiff's hired man made a frequent inspection of the household goods and had a general oversight of the buildings during the day, is not a full equivalent for the constant supervision involved in the occupancy of the premises as a customary place of abode, and the actual presence in the building of those who are living in it and using it as a dwelling-house day and night. *Ashworth* v. *Builders Ins. Co.*, 112 Mass. 422; *Hermann* v. *Adriatic Ins. Co.*, 85 N. Y. 162; *Bonenfant* v. *Ins. Co.*, 76 Mich. 654; May on Ins. 249, A; Wood on Insurance, page 180.

Whether or not the risks of an insurance on buildings were materially increased by their non-occupancy under peculiar circumstances and conditions, and the construction of section 20 of chapter 49 of the revised statutes, with special reference to the burden of proof, were questions considered by this court in the recent case of *Jones* v. *Granite State Insurance Company*, ante, p. 40. Assuming without deciding, in the case at bar, that the risks may have been appreciably increased by the facts relating to the occupancy of the buildings, the evidence afforded by the natural presumption of such an increase of risk, on the one hand, and by the immediate supervision, care and oversight on the other, may reasonably be deemed so nearly in equilibrio, as to strengthen

the probability underlying the plaintiff's third proposition that the defendants waived any forfeiture which may have occurred by reason of the non-occupancy of the dwelling-house.

The question of waiver or estoppel in this class of cases has frequently been before the courts in different jurisdictions, and its solution should now be attended with little or no difficulty.

A waiver involves the idea of assent and assent is primarily an act of the understanding. It presupposes that the person to be affected has knowledge of his rights, but does not wish to enforce them. *Jewell* v. *Jewell*, 84 Maine, 304. It is an "intentional relinquishment of a known right," (*Robinson* v. *Penn. Fire Ins. Co.* post); and is a question of fact whenever it is to be inferred from evidence adduced, or is to be established from the weight of evidence. *Williams* v. *Relief Association*, 89 Maine, 158; *Nickerson* v. *Nickerson*, 80 Maine, 100. Again it may happen that a waiver of a breach of the condition in the policy was not actually intended; but if the conduct and declaration of the insurer are of such a character as to justify the belief that a waiver was intended, and acting upon this belief the insured is induced to incur trouble and expense and is subjected to delay to his injury and prejudice, the insurer may be prohibited from claiming a forfeiture for such a breach, upon the principles of equitable estoppel. Wood on Fire Ins. 176-832-837, and cases cited; May on Insurance, § 504; *Peabody* v. *Accident Association*, 89 Maine, 96.

In support of the claim of waiver in this case the plaintiff calls attention especially to the facts disclosed by the testimony of Mr. Champlain, the resident secretary of the North British Mercantile Insurance Company having general management of their business in this state. He was notified of the fire by Mr. Gammon, the local agent at Mechanic Falls, who issued both of the policies in suit. On the 26th of July he met Mr. Gammon at his place of business and together they went to the Hanscom place. Mr. Champlain there learned from Mr. Gammon that the "family had not been in the house since the fall before, and was informed by the plaintiff that Thurston the night before the fire went to his home after doing the chores, and did not return to the place. Mr.

Gammon says he was informed of the non-occupancy on the morning after the fire. Continuing his testimony, Mr. Champlain says: "I then questioned him as to the value of the building. He said, some eight or nine years ago, I purchased this place of my sister, Mary A. Lane; I gave her $2500 for the place. Since then I have laid out a good deal of money on the buildings, as much as $10,000. . . . . I then questioned him about the furniture. He said he had a good deal of furniture in it. Then, I said to him, are you prepared to-day to give a schedule showing the value, or the values, of the property burned. He said no, I am not; the property was worth more than the insurance, and I do not see the need of it. I told him it would be necessary for him to make a schedule, that he probably had his bills of his repairs to the house, and also of his furniture, that he should take those bills and from them and from what information he had, he should make us a schedule, showing the correct value of the house and the barn, also of the personal property in the house, and the personal property in the stable or barn; that he could take time to do it, that what we wanted in such a case was the real value of the property at the time of the fire. He said he did not see any need of doing it, but he would do it. I told him, when he had his schedule completed, to give it to our agent who was present and he would forward it to me. Upon its receipt I would endeavor to make arrangements with Mr. Moses R. Emerson, the general agent of the Home Insurance Company, to meet me and come to see him.

"Then we went up to the ruins of the fire, which was quite a little distance from the Walker house. Mr. Hanscom showed me the size of the buildings, explained to me the rooms of the main house, he showed me the remains there were of the plumbing, the soil-pipe that came down, he said, from the bathroom and explained to me about the construction of the house; then he took the L part in the same way; and the stable and the barn.

"Then we returned, and going by the Thurston house he pointed it out and said this is where Mr. Thurston lived, and this is where the furniture, that was removed from the house, is now located. I asked him to show it to me, and we went in; I think it was sort of

a shed or carriage-house, something of that nature; it was not in the main house. It was all piled up there indiscriminately; there was quite an amount of it. I said, it will be necessary for you to also make a schedule of this property saved, and give that to Mr. Gammon, our agent, with the other schedule I spoke to you about.

"The schedule was sent to me very shortly after that; I think I received it in July. Upon my return, I endeavored to arrange a meeting between Mr. Emerson of the Home, Mr. Hanscom and myself. On the 27th of August, Mr. Emerson sent Mr. Wetherbee, special agent of the Home Insurance Company, to Portland, and we came together to Mechanic Falls, drove to Poland to find Mr. Hanscom. I then made arrangements for Mr. Emerson and Mr. Hanscom to meet me at my office on the 4th of September. They came there; Mr. Emerson and I talked over the schedules that we had received, gave Mr. Hanscom blanks upon which to make his proofs, and told him to make them out, which he did, and served upon our agents the 10th day of September.

"I received that proof from Mr. Gammon on the 11th. Between the time I first went to see Mr. Hanscom in July and the 11th of September, when I received the proof, Mr. Hanscom came into my office twice, I think, and said he thought we ought to pay the loss; that he had had a large loss there; he thought we ought to pay it. I told him I would arrange, as soon as possible, to have Mr. Emerson and myself to see him, and then we would instruct him what to do about his proof, so that he could go ahead and make it. On one of those occasions I said to him, I have made some inquiries about the bills of goods purchased at W. T. Kilborn & Co.'s, and Walter Corey & Co., and I find that they were largely purchased by Mrs. Pope, and that small amounts were purchased by Mr. Hanscom; I also find by looking at the records in Auburn that the price you paid Mrs. Lane for the property was $1000, that no money seemed to pass, as on that day you gave her a bond back for $1000, to support her during the remainder of her life; these statements do not exactly correspond with those you made to me. Mr. Hanscom was quite excited, rather violent in his talk.

"On the 10th day of October I was called to the telephone, and

learned that Mr. Hanscom wished to speak to me. He said, I want to have that claim of mine settled to-day. I said, I cannot settle it to-day, Mr. Hanscom, the claim is not due, and we should not think of settling the claim before it is due. He said the claim is due to-day. I said no, the claim is not due until the 11th day of November; your proofs were received on the 11th of September, and the sixty days carry it until the 11th of November. He said, I am coming down and I want that claim settled to-day. I said, it will do no good for you to come down, Mr. Hanscom, as we shall not settle the claim to-day; we shall not settle it before the 11th day of November, and it is somewhat doubtful if we do then. About half past 12 of that day he came to my office and demanded payment. I told him that we should not pay it. He said the claim was due. I told him the claim was not due. He insisted that he made his proof on the 10th of August. I told him the proof was not made until the 10th of September, and received by me the 11th of September. Mr. Hanscom was quite excited about it. He said he would sue us, he would make us pay it all, that we would have to pay interest from the 10th day of August. I said to him that remains to be determined. On the 12th day of November, Mr. Hanscom again came into my office and demanded his pay. He said the claim had become due, and he wanted his money. I told him that I should not settle that day, that I would confer with my company, and also with Mr. Emerson of the Home, then we would let him know what we decided to do.

"I conferred with my company, and with Mr. Emerson, and we both declined to pay. Mr. Emerson, afterwards, arranged a meeting between Mr. Hanscom, himself and myself at my office on the 19th day of November. At that meeting Mr. Emerson and I thoroughly discussed the matter, decided that we would not pay the claim, informed Mr. Hanscom that on account of the non-occupancy of the property, the excessive valuation put upon the furniture and information that we had received that the personal property belonged largely to other people, we declined to pay it. Mr. Hanscom was considerably excited, said the property all belonged to him, that he would make us pay, sue us, and so on,—the old

story.    I said to Mr. Hanscom, when I first came to see you in regard to this matter, you told me that you paid $2500 to your sister, Mary A. Lane, for this place.    I went to the records and found that you paid $1000.    You told me that you purchased your furniture largely of Walter Corey & Co. and W. T. Kilborn & Co. I went to them, and found that you purchased very little furniture of them, that a large part of the furniture was purchased by Mrs. Pope, and paid for by Mr. Pope's checks; that on account of the non-occupancy of the property and the excessive value put upon the furniture, and the information that we had that it largely belonged to others, we declined to pay; we had concluded that we did not owe him anything.    Mr. Hanscom was very much excited, talked violently, gesticulated violently, declared we would have to pay it with interest, etc., and went out.

" When I said to him you told me that you paid $2500 and I found that you paid $1000, he said, yes, I afterwards made it up to $2500.    I said to him, I found no record of any such deed."

On cross-examination the witness further testified as follows:

Q.    Having noticed that the buildings, as you claim, were not occupied, you still directed Mr. Hanscom to make out a proof of loss, did you not?

A.    I directed him to make out a schedule of the articles burned; told him how to do it.    They were furnished within a few days.    Later I furnished him the blanks to make out the formal proofs of loss.

Q.    Told him how to do that?

A.    I do not think I gave him any instruction at that time. Mr. Emerson and I gave him the blanks, and told him to make out his proofs of loss.

Q.    At that time you had raised no question with him in regard to the increased risk by non-occupancy?

A.    I had mentioned the non-occupancy, and ascertained the non-occupancy at the time I first saw him.

Q.    You did not give it to him at that time as a reason for not paying?

A.    No question of paying at that time.

Q.   You still directed him to go on and make out his proofs of loss?

A.   I gave him the blanks.   I did not direct him how.   I did not tell him, at that time, I should not pay it because the buildings were not occupied.

Q.   Did you ever tell him, until the 11th or 12th of November, that you should not pay on the ground of non-occupancy?

A.   I do not think I ever told him we should not pay on any ground, until that time.   He furnished the proofs of loss.   I told him on one occasion that I had received information from other people that somebody else owned part of the property.   I think I told him from whom I had received the information; from W. T. Kilborn & Co., and Walter Corey & Co., and N. Q. Pope.   On one occasion I told Mr. Hanscom that I had received information from N. Q. Pope.   Mr. Pope resides in the State of Maine part of the time; his home is near Portland, a portion of the time; his family is there a portion of the time.

According to Mr. Champlain's testimony it was November 19 "when they informed the plaintiff that they would not pay on account of non-occupancy, among other reasons."   Yet on November 30, Mr. Emerson wrote to the plaintiff's attorney saying: "We have had several conferences with Mr. Hanscom, looking to a final settlement of his claims, but fail to arrive to any agreement as to the amount for which the company is liable under the policy."

It is manifest from this testimony that, being reasonably satisfied with the precautions taken by the plaintiff for the protection of his buildings, the defendants' agents had no thought of contesting the claim on the ground of non-occupancy until they became irritated and incensed by the plaintiff's persistency and impatience in pressing his demand for payment, and by the discussion over the value and ownership of the furniture.   The foregoing acts and declarations of the agents afford stronger indication of an intention to waive the forfeiture, if any, and, when examined in their relation to the action of the plaintiff induced thereby, present also more satisfactory grounds for an estoppel than those held sufficient for the purpose in numerous decided cases analogous to the present.

In *Titus* v. *The Glens Falls Insurance Company*, 81 N. Y. 410, the policy contained a condition declaring it void in case foreclosure proceedings were commenced against the insured property, and such proceedings having been commenced and the property advertised for sale before the fire, the defendants claimed a forfeiture. Upon this branch of the case the court say : " The insurance company may, consulting its own interests, choose to waive the forfeiture, and this it may do by express language to that effect, or by acts from which a waiver follows as a legal result. . . . . But it may be asserted broadly that if, in any negotiations or transactions with the insured, after knowledge of the forfeiture, it recognizes the continued validity of the policy, or does acts based thereon, or requires the insured by virtue thereof to do some act or incur some trouble or expense, the forfeiture is as a matter of law waived; and it is now settled in this court after some difference of opinion, that such a waiver need not be based on any new agreement or estoppel. . . . . After the fire, and after the defendant had notice of the proceedings, it required the insured to appear before a person appointed by it for that purpose, to be examined under the claim in the policy hereinbefore mentioned, and he was there subjected to a rigid, inquisitorial examination. It had the right to make such examination only by virtue of the policy. When it required him to be examined, it exercised a right given to it by the policy. It then recognized the validity of the policy, and subjected the insured to trouble and expense after it knew of the forfeiture now alleged, and it cannot now, therefore, assert its invalidity on account of such forfeiture." See also *Landers* v. *Watertown Insurance Company*, 86 N. Y. 414 (40 Am. Rep. 554) ; *Trippe* v. *Provident Fund Society*, 140 N. Y. 23.

In *Gans* v. *St. Paul F. & M. Insurance Company*, 43 Wis. 108 (28 Am. Rep. 535) the policy contained the usual provision that if the building should become unoccupied without the consent of the company, the policy should be void, and the loss occurred during the period of non-occupancy. It was held in accordance with the previous decisions of that court that " the requiring of further proofs of loss after the company was chargeable with notice or

knowledge that a condition of the policy had been broken (which requirement subjected the plaintiff to expense and delay) is a waiver of the breach, and estops the company to claim a forfeiture of the policy." See also *Webster* v. *Phœnix Insurance Company*, 36 Wis. 67, (17 Am. Rep. 479); and *No. W. M. Life Insurance Company* v. *Germania Fire Insurance Company*, 40 Wis. 446. So also in *Cannon* v. *Home Insurance Company*, 53 Wis. 594, it was held that where there has been a breach of condition, and the insurer with full knowledge of the breach, and without denying its liability on that ground, requires the assured to furnish, and he does furnish, at some trouble and expense, proofs of loss under the policy, whether first or additional proofs, the breach could not be set up as a defense.

In *Penn. Fire Insurance Company* v. *Kittle*, 39 Mich. 51, a forfeiture was claimed by reason of additional insurance, and the question of waiver was submitted to the jury as one of fact, and they found in favor of the insured. In the opinion by Cooley, J., it is said: "We think the jury were warranted in finding that the defendant, by calling upon the plaintiff to go on and make out her proofs and by requiring her to be at the trouble and expense of correcting these to satisfy the criticism made by the agent, without giving her to understand that the company would rely upon the forfeiture, should be held to have waived it; and that if it was the purpose all the while to insist upon it, the agent did not act towards her in good faith."

In *Cleaver* v. *Traders Insurance Company*, 71 Mich. 414, (15 Am. St. Rep. 275) it was also claimed that a forfeiture had been incurred by taking additional insurance contrary to the conditions of the policy. But with full knowledge of the facts showing such forfeiture, the company failed to notify the insured of an intention to insist on such defense until after its adjuster had examined into the loss and received from the insured all the information he asked for in relation to its extent and value, taking two days of his time and the services of a man furnished by the insured, and making no point of the taking of such additional insurance as a reason why the insurance should not be paid. And it was held that these facts

were sufficient to warrant the jury in finding a waiver of the for-
feiture by the company.

See also *Marthinson* v. *No. British and Mer. Insurance Company*,
64 Mich. 372, in which the court say: "With a knowledge of
all the acts creating the forfeiture claimed upon the trial, the
defendant company put the assured to expense in perfecting proofs
of loss, which under the present claim of defendant were wholly
unnecessary, as the proofs however perfect, were valueless, if the
defense of forfeiture was a good one. By this action the defendant
company must be held to have waived such defense." The ques-
tion of waiver, however, appears to have been submitted to the jury
as a question of fact, and their finding was in favor of the plaintiff.

In *Niagara Fire Insurance Company* v. *Miller*, 120 Pa. St. 504,
(6 Am. St. 726), the court say: "It is not denied that the
encumbrances exceeded the amount stated by the insured. Whether
it was by accident, ignorance or design does not appear. The
court below . . . . submitted the question of waiver to the
jury who found against the company. I do not think that the
mere fact of the company's calling upon the assured to furnish the
preliminary proofs of loss would of itself be a waiver of the com-
pany's right to avoid the policy. Cases might arise where such
proofs might be necessary to enable the company to show the
breach of warranty. There must be an intention to waive a for-
feiture by notice or acts inconsistent with acts exercising the right
to forfeit. . . . . With full knowledge of the encumbrances,
the company not only called for proofs of loss, but required the
assured to furnish full plans and specifications of the building
destroyed, and joined in the appointment of appraisers. . . . . .
The company was bound to good faith to the assured, and if, with
the knowledge in its possession of every fact upon which to avoid
the policy, they misled the plaintiff for nearly a year, subjected
him to the expense of procuring plans and specifications of his
building, and never informed him that they would not pay because
the policy was avoided, they have no ground to complain if they
are now held to be estopped from setting up such a defense."

In *Peabody* v. *Accident Association*, 89 Maine, 96, the court

say : "It would have been an inexcusable imposition to invite the plaintiff to make up proofs of loss when the intention of the company was to wholly disregard the same whatever might be the result of their investigation."

If the defendants in the case at bar had frankly denied all liability on the policies by reason of the alleged forfeiture, it would have been a waiver of proofs of loss and the cause of action would have accrued within sixty days after such denial, *Marston* v. *Mass. Life Insurance Company*, 59 N. H. 94; *Walsh* v. *Insurance Company*, 54 Vt. 351; while the practical effect of the course taken by the company towards the plaintiff was a postponement of the action for more than four months from the date of the fire. Instead of saying to the plaintiff explicitly and unequivocally, immediately after the fire, that it clearly appeared from his own admission and the statements of Thurston that his policies were forfeited for non-occupancy, and that they must absolutely refuse to pay the loss, they informed him that it was *necessary* for him to furnish a schedule of the furniture, that he could take time to do it, that what they wanted was the real value of the property and that when the schedule was prepared the agents would come and see him; they furnished him with blanks on which to make his proofs of loss, and gave him instructions with reference to the proofs; they subjected him to the trouble and expense of preparing these schedules and formal proofs of loss and required his attendance upon them at Portland on two occasions for the purpose of holding conference in regard to the ownership of the property, and the extent of the loss. The conclusion is irresistible that, during the four months succeeding the fire, the defendants either intended in good faith to waive the alleged forfeiture arising from non-occupancy, and to pay the amount of the loss when satisfactorily determined; or, they were guilty of "inexcusable imposition" in subjecting the plaintiff to unnecessary trouble and expense, and in delaying his action, for several months, by encouraging the delusive hope that the loss would be paid upon receipt of due proofs of loss. The former inference is warranted by the evidence, is more creditable to the defendants and more equitable toward the

plaintiff. It is accordingly the opinion of the court, that the defendants cannot now be permitted to set up in defense a forfeiture of the policy alleged to have been created by the non-occupancy of the buildings.

II. The second ground of defense is that the household furniture and other personal property on the premises became encumbered by a chattel mortgage for $1000 on the 22d day of July, 1895, and that the policy was therefore forfeited before the fire, which occurred near midnight on the same day. It has been seen to be one of the conditions that "this entire policy shall be void if the subject of the insurance be personal property and be or become encumbered by a chattel mortgage." It appears from the copy of the mortgage in the case, that it covered the land and buildings in question, "together with all the furniture contained on said premises, with all the stock and fixtures on the premises hereby mortgaged." It is not claimed that the forfeiture was incurred by virtue of the mortgage on the real estate (see *Smith* v. *Mut. Fire Insurance Company*, 50 Maine, 96) but it is insisted that this encumbrance placed on the personal property without the consent of the defendant voided the policies.

In regard to this transaction the plaintiff testified as follows: " I 'placed' a mortgage on this place the 22nd of July. The buildings were burned on the night of that day. I did not get the money on the mortgage until the next morning, the 23rd. I received the telegram that the buildings were burned after I had . . . . purchased my tickets; it must have been one o'clock in the afternoon." It also appears from the certificate of the county clerk on the mortgage, that the signature of the commissioner, who took the acknowledgment, that the instrument was not presented to him for authentication until July 23. In view of these facts it does not satisfactorily appear that the transaction was completed by the delivery of the mortgage and the payment of the money until after the fire had occurred. It is a reasonable inference that the instrument was delivered after the clerk's certificate had been obtained and at the same time the money was received. In any event, it is obvious that the existence of this encumbrance

was wholly unknown in Poland at the time of the fire, and that it could not possibly have had the effect to increase the risk of the insurance. Furthermore, although the mortgage was recorded in Androscoggin county on the 24th of July, and the defendants' agent must have known of the existence of it from his examination of the records early in September, there was no intimation from the defendants, for nearly three months following, that they intended to refuse payment on account of this chattel mortgage; and in view of all the evidence heretofore recited, showing an intention to waive any forfeiture, it would now be grossly inequitable to give effect to this encumbrance as a reason for avoiding the policies.

III. Finally it is contended, by the defendants, that the policies are both void by reason of false swearing on the part of the plaintiff in his formal proofs of loss and in his testimony before the court.

It has been seen that each of the policies in suit is by its own terms declared void "in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof;" and in such a case it is settled law in this state that if the insured knowingly and purposely makes false statements on oath in his proofs of loss in relation to the amount or value of the goods destroyed, the policy is thereby voided both as to the buildings and personalty covered by it, although the actual losses, truly stated in the proofs of loss, may exceed the whole amount of the insurance. The forfeiture of all claim under the policy is the penalty for . . . . . wilfully false swearing, whether such false swearing in fact operates to defraud the company or not. *Dolloff* v. *Phœnix Insurance Company*, 82 Maine, 266. But in determining whether an excessive valuation, for instance, of any article of personal property was the result of wilfully false swearing, or of an error in judgment, misinformation, misrecollection or mistake, it is obviously material and important to consider the amount of the actual loss in relation to the amount of insurance, and to inquire whether the insured could have had any motive to swear falsely in order to swell the amount of the loss, when it was already conceded that the loss, honestly stated, would exceed the

amount of insurance. Erroneous estimates and innocent misstatements are not a cause of forfeiture. As stated in the instruction sustained by this court in *Linscott* v. *Orient Insurance Company,* 88 Maine, 497 : " If a man attempt to defraud the company by means of false swearing . . . he has forfeited his whole claim. If he is blameless in these particulars although inaccurate, although he has made misstatements that are not chargeable to his dishonesty, not chargeable to his falsehood, not chargeable to his desire and determination to cheat and defraud and deceive, but are mere mistakes of either judgment or memory, then you will deal with the witness accordingly. Punish no man for a mistake, but visit condemnation upon men who are false and fraudulent, and upon such only."

The length to which this opinion has already been extended, by reason of the importance of the questions involved, forbids any discussion of the details of the evidence relating to this branch of the case. The announcement of conclusions is of more importance to anxious suitors and less burdensome to the profession when published, than the elaborate analysis of voluminous testimony.

The total insurance on the buildings was $3000. The plaintiff states in his proofs of loss, and in his testimony, that they cost him $8500. Forest Walker, a carpenter who has for many years had charge of the work at Poland Springs, was called as a witness for the defendants, and testified that at the time of the fire they were worth from $5500 to $6000. The valuation placed upon the buildings by the defendants' local agent, Mr. Gammon, was from $4000 to $5000.

The whole amount of insurance on the personal property, not including the horses, was $2000. The insurance on the horses was $500, but as the plaintiff sustained a loss of only one horse of the estimated value of $100, his claim for insurance on the personal property is for $2100. In the proofs of loss the estimated value of furniture destroyed is $2785.75, and of the property saved $1795, a total of $4570.75. In the testimony of the defendants' agent, Mr. Gammon, the value of the property covered by the furniture clause is estimated at $3500, and the value of the other

personal property is fixed in the proofs of loss at $1262.50, a total of $4762.50. According to the proofs of loss, the value of the personal property destroyed and damaged was $4048.25, nearly double the amount of insurance claimed. It has also been seen that the parties stipulated in the report that, if the plaintiff is entitled to recover, he is to have the full amount of the insurance claimed. Indeed, the testimony of the plaintiff in relation to the value of the multitude of items involved in the inquiry indicates entire confidence on his part that the losses greatly exceeded the insurance, and leaves the impression that he considered all efforts to make a critical examination of values as unimportant and superfluous. Under these circumstances, it would seem that he had no motive to make statements on oath that were knowingly and designedly false in relation to values either in his proofs or in his testimony. It must be admitted, however, that his valuation of the personal property in many instances appears to be excessive, and that there is often a discrepancy between the value stated in the proofs of loss, and the estimate given in his testimony. He sometimes betrays impatience under cross-examination, and gives answers that are hasty and ill-considered, and makes statements that are often indefinite and apparently inaccurate. The schedule appears to have been the result of the combined efforts of himself and his wife and son and Thurston, the hired man; and he evidently testifies under the embarrassment which any householder would experience in attempting to recall specifically a multitude of articles in a dwelling-house destroyed by fire, and to fix the price or estimate the values of those which he did not purchase and with which he was not familiar. His testimony shows confusion and uncertainty resulting from his attempts to apply his memory, make use of his information, and exercise his judgment in regard to the different articles. Before the change in his circumstances, which made it necessary to raise money on mortgages, he appears to have lived in affluence and to have been accustomed to select purchases of the best quality with but little regard to the expense. He shows that partiality in favor of the worth of his own property and that tendency to over-estimate the value of favorite and familiar articles, which

are the proverbial attributes of ownership. But it appears from his testimony that, with the exception of the instances in which he stated the cost price of the articles, his statements are for the most part such estimates, expressions of opinion, and even conjectures as he might reasonably be expected to give, and such as were not calculated or designed to mislead or deceive. In some instances he may be censurable for not exercising more care and caution in giving his answers, or more frankness and promptness in disclaiming the requisite knowledge to make accurate statements; but it appears, from the schedules furnished the defendants, that he placed relatively the same estimates upon the value of the property saved as he did upon that which was lost. The claim that the plaintiff was not the owner of all the furniture was abandoned by the defendants.

The conclusion therefore is, after a careful and patient examination of the case, that the charge of wilfully false swearing on the part of the plaintiff is not so clearly and fully established by the evidence as to justify the court in declaring that he has incurred the penalty of forfeiting his entire insurance.

According to the stipulations in the report, the entries must be,

> *Judgment for the plaintiff against the Home Insurance Company for $2100 and against the North British and Mercantile Insurance Company for $3000, without interest in either case.*